IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

TOCCARA DAVIS, as Guardian of
D.W., a Minor,

      Plaintiff,

      v.

BOJ of WNC, LLC,

      Defendant.

               CV 121-155

## O R D E R

Before the Court is Defendant's motion for summary judgment
(Doc. 103) and Defendant's request for filing of original discovery
(Doc. 108). For the following reasons, Defendant's motion for
summary judgment is **GRANTED IN PART AND DENIED IN PART** and
Defendant's request for filing of original discovery is **DENIED AS
MOOT.**

## I. BACKGROUND

Plaintiff, Toccara Davis, as Guardian of D.W,[1] a minor, brings
claims for premises liability and negligent hiring, training,
supervision, and retention against Defendant, BOJ of WNC, LLC,[2]

---

[1] The Parties and the Court refer to the minor under a pseudonym. (See Doc. 1,
at 2.)

[2] BWNC is a franchisee of Bojangles®. (Doc. 104, at 1.)

("BWNC" or "Defendant") for the alleged sexual assault and rape of her daughter, D.W.   (Doc. 1.)

## A. Alleged Incident[3]

On June 28, 2021, D.W., a sixteen-year-old crewmember of Bojangles® ("BOJ") located in Augusta, Georgia was working a shift with her supervisor, Nick McLamore ("Mr. McLamore").   (Doc. 104, at 4, 10.)   Mr. McLamore was the Assistant General Manager of the BOJ store.   (Id. at 5.)   D.W. worked at the front counter during her shift, and one of her responsibilities included cleaning the restrooms.   (Id. at 10.)   "Towards the end of [her] shift, Mr. McLamore requested that D.W. clean the restrooms."   (Id. at 11.) D.W. entered the men's restroom and "Mr. McLamore went into the men's restroom behind D.W."   (Id.)   After cleaning the restroom, D.W. went to the stall to pick up trash, and "Mr. McLamore followed [her] into the stall."   (Id.)   According to Plaintiff, Mr. McLamore closed the stall door, took her phone, and then slid her phone across the floor.   (Doc. 116, at 26-27.)   Mr. McLamore proceeded to touch D.W. on the neck and stomach.   (Doc. 104, at 11.)   She told him to stop, which he did.   (Id.)   D.W. left the restroom and returned to help other employees finish cleaning the restaurant. (Id.)   According to Defendant, "D.W. did not tell any employee

---

[3] In its Statement of Undisputed Material Fact ("SUMF"), Defendant states it "does not dispute the allegations regarding what happened between D.W. and Mr. McLamore in [the] bathrooms on June 28, 2021 for [the] purposes of its Motion for Summary Judgment" but it understands Mr. McLamore disputes the allegations. (Doc. 104, at 10 n.1.)

about [Mr.] McLamore touching her in the men's restroom." (Id. at 12.)   According to Plaintiff, "D.W. did not tell any BOJ employee about the first sexual assault between the time it happened and between the time of the [alleged] rape."[4]   (Doc. 116, at 28.)

A few minutes after helping other employees clean the restaurant, D.W. went to clean the women's restroom.   (Doc. 104, at 12.)   "Later that night, Mr. McLamore . . . told D.W. to clean the women's restroom again because it was not clean."   (Id.)   D.W. and Mr. McLamore went into the women's restroom together and he began pointing out what she did not clean the first time.   (Id.) He then approached her from behind while she was in a restroom stall, and according to Plaintiff, he proceeded to rape D.W.   (Doc. 116, at 29.)

The alleged rape lasted approximately three or four minutes, and D.W. left the restroom while Mr. McLamore remained behind. (Doc. 104, at 12.)   "D.W. then left the [BOJ] in a vehicle driven by her mother" and "did not speak with her mother about what happened . . . that night" but did speak with her then-boyfriend about what happened.   (Id. at 13.)

The following day, D.W. went to work and showed Assistant General Manager Roberta Jackson ("Ms. Jackson") a text message

---

[4] Defendant disputes whether the incident constitutes rape, as it characterizes the interaction as "sexual intercourse."   (Doc. 104, at 12.)   Whether the incident constituted rape is not a question before the Court, and as such, the Court refers to the incident in the women's restroom as the "alleged rape."

outlining her view of what occurred on June 28, 2021. (Id. at 4, 13.) "Ms. Jackson then showed the text message to [General Manager Isley Thomas ('Mr. Thomas')] and called Area Director Bridget Moore ('Ms. Moore')." (Id. at 4, 13.) Ms. Moore came to the retaurant, and D.W. showed Ms. Moore "the text message outlining what she claimed happened between her and Mr. McLamore." (Id. at 13.) "Ms. Moore then called her supervisor, Patrick Sheline, and told him what she observed at the [restaurant]." (Id.)

## B. Mr. McLamore

Mr. McLamore was the thirty-one-year-old Assistant General Manager of the BOJ where D.W. was employed. (Id. at 5; Doc. 113, at 3.) When Mr. McLamore started as Assistant General Manager, he received a copy of BWNC's employee handbook, which contained the company's sexual harassment policy. (Doc. 104, at 5.) Prior to the sexual assault and alleged rape on June 28, 2021, D.W. did not have any issues with Mr. McLamore. (Id. at 6.) According to Defendant, "D.W. never requested that she not work with Mr. McLamore." (Id.) Plaintiff disputes this, and states "D.W. had requested that [Ms.] Jackson manage the night shift in lieu of [Mr.] McLamore because [Mr.] McLamore made her feel uncomfortable." (Doc. 116, at 10.) D.W. and Mr. McLamore communicated with each other over text message, but according to D.W., she did not think Mr. McLamore flirted with her. (Doc. 104, at 6; Doc. 116, at 13.) Prior to June 28, 2021, D.W. never told

4

anyone at BWNC that she felt uncomfortable with Mr. McLamore, never saw Mr. McLamore engage in any sexually inappropriate or physically threating conduct with another employee or non-employee, nor had heard any employee or non-employee complain that they felt uncomfortable with Mr. McLamore. (Doc. 116, at 14.)

## C. Prior Reports

The Parties heavily dispute whether Mr. McLamore engaged in sexually inappropriate behavior prior to the June 28, 2021 sexual assault, and if he had, whether it was reported to Defendant. According to Defendant, "[n]o one ever told Ms. Jackson, Mr. Thomas, or [Assistant General Manager Carol Thompkins ('Ms. Thompkins')] that Mr. McLamore made them uncomfortable or acted in a sexually inappropriate or physically threatening manner." (Doc. 104, at 8.)  Further, Defendant argues, "[b]efore June 28, 2021, D.W. told crewmember Tatiyana Woods ('Ms. Woods') that Mr. McLamore 'felt weird to her,'" and in May 2021, Ms. Woods told Ms. Jackson "that Mr. McLamore was making D.W. feel weird and that D.W. did not like the way [he] looked or acted toward her." (Id. at 7.) Defendant states that "[i]n May 2021, Ms. Woods also asked Ms. Thompkins why Mr. McLamore was acting weird toward D.W." and "[p]rior to June 28, 2021, Ms. Woods told Mr. Thomas that Mr. McLamore was a 'creep.'" (Id. at 7.)

According to Plaintiff, "D.W. told Ms. Woods 'plenty of times,' that [Mr.] McLamore 'felt weird to her' . . . [and] made

[D.W.] feel uncomfortable." (Doc. 116, at 15.) Plaintiff states that Ms. Woods "reported [Mr.] McLamore's sexually inappropriate behavior to [Ms. Jackson]," and Ms. Jackson laughed in response and said, "[h]e wants a grown woman[,] [h]e don't want no kids." (Id.) Furthermore, Plaintiff alleges Ms. Woods told Ms. Thompkins that "[Mr.] McLamore would walk up behind us and touch our shoulders and tell us we're doing a good job, but it was just weird at the time." (Id. at 16.) Plaintiff states Ms. Thompkins responded to Ms. Woods that Mr. McLamore "don't want no kids." (Id.) Moreover, Plaintiff states Ms. Woods reported Mr. McLamore's sexually inappropriate behavior to Mr. Thomas who said he would look into it, but never did. (Id.)

Additionally, according to Plaintiff, several other witnesses reported Mr. McLamore's behavior: (1) crewmember Khashiya Thomas ("Ms. Thomas"), who is the same age as D.W., "told [Ms. Jackson] that [Mr.] McLamore was looking at her and talking to her in a sexually inappropriate way"; (2) "[Ms. Jackson] testified that the day before the [alleged] rape, [Shift Leader Bobby Johnson ('Mr. Johnson')] told her, 'something was going on' between D.W. and [Mr.] McLamore"; (3) "[crewmember] Imani Spencer [('Ms. Spencer')] testified that she told a manager named Rod Carter [('Mr. Carter')] that [Mr.] McLamore was being inappropriate with D.W."; (4) "[Mr. Carter] testified that [Mr.] McLamore was sexually attracted to D.W. in a 'perverted way' and that something might happen"; and

6

(5) crewmember "Brionna Williams [('Ms. Williams')] testified that, before the [alleged] rape, she told [Mr. Thomas] that she did not want to work with [Mr.] McLamore because he made her feel uncomfortable." (Id. at 8, 18-19.)

The Parties do agree that "[o]n June 27, 2021, [Mr. Johnson] told Ms. Jackson that she needed to look out for D.W. and Mr. McLamore because he thought there was 'something going on between them' and he liked her." (Id. at 16.)   The Parties also agree that "Ms. Jackson told Mr. Johnson she would watch Mr. McLamore and D.W. . . . [to] observe if anything was going on between them." (Id. at 17.)

Having set out the overall facts relevant to this action, the Court turns to the pending motions.


## II. MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on all of Plaintiff's claims (Doc. 103), Plaintiff responded in opposition (Doc. 113), Defendant replied (Doc. 117), Plaintiff sur-replied (Doc. 124), and Defendant sur-replied (Doc. 129).   The Court addresses Defendant's motion below.

### A. Legal Standard

Defendant moves for summary judgment under Federal Rule of Civil Procedure 56(a).   Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." <u>United States v. Four Parcels of Real Prop.</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation omitted and internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, as is the case here, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex Corp.</u>, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its

initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. <u>Jones v. City of Columbus</u>, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).   A mere conclusory statement that the non-movant cannot meet its burden at trial is insufficient.   <u>Clark</u>, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."   <u>Id.</u>   When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.   <u>Id.</u>   If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."   <u>Fitzpatrick</u>, 2 F.3d at 1116.   If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."   <u>Id.</u> at 1116-17.   The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.   <u>See Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th

Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

"Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins. Co., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007). Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." Id. (citing Resol. Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Accordingly, the Court will only review the materials the parties specifically cite and legal arguments they expressly advance. See id.

In this action, the Clerk of Court provided Plaintiff notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 107.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration. In reaching its conclusions herein, the Court has evaluated the Parties' briefs, other submissions, and the evidentiary record in the case.

## B. Discussion

Defendant moves for summary judgment on all of Plaintiff's claims. (Doc. 103.) The Court addresses Defendant's motion below.

### 1. Premises Liability Claim

Defendant argues it is entitled to summary judgment on Plaintiff's premises liability claim for two reasons: (1) there is no evidence of a "substantially similar crime" as required; and (2) in order for Defendant to be held liable, it must have had superior knowledge of the risk, which it did not.[5] (Doc. 103, at 9-15.) In response, Plaintiff argues she does not need to show prior crimes to establish foreseeability, rather, she only needs to show that the risk of sexual assault was foreseeable based on "the totality of the evidence," and she argues Defendant had superior knowledge of the danger. (Doc. 113, at 20-23.)

Defendant argues "Plaintiff must establish that the incident was reasonably foreseeable based on prior substantially similar *criminal* conduct." (Doc. 103, at 9-10 (emphasis in original).) Further, Defendant asserts "Plaintiff cannot satisfy her burden as she produced no evidence that [Defendant] had knowledge of substantially similar crimes . . . [and] there is no evidence in

---

[5] The Court notes that in <u>Georgia CVS Pharmacy, LLC v. Carmichael</u>, the Georgia Supreme Court held that reasonable foreseeability is part of the duty element in a premises liability claim. No. S22G0527, 2023 WL 4247591, at *7 (Ga. June 29, 2023) ("We hold that the reasonable foreseeability of third-party criminal conduct is properly considered as part of a proprietor's duty to exercise ordinary care in keeping the premises and approaches safe under [O.C.G.A.] § 51-3-1 although considerations of foreseeability also inform other elements of a premises liability claim . . . ."). Here, Defendant appears to address the issues of reasonable foreseeability and superior knowledge as they relate to Defendant's duty. (<u>See</u> Doc. 103, at 9-11.)

the record of *any* crime on the premises, let alone a substantially similar crime involving an employee of [Defendant]." (<u>Id.</u> at 10-11 (emphasis in original).)

Under Georgia law, a showing of a "substantially similar crime" is not required. <u>See Carmichael</u>, 2023 WL 4247591, at *7. ("And though, notably, two of our prior cases might be read to suggest a bright-line rule requiring evidence of a 'substantially similar' prior crime, we now reject any such reading.").[6] Rather, the question the Court asks is "whether the totality of the circumstances establish reasonable foreseeability such that the proprietor has a duty to guard against that criminal activity." <u>Id.</u> at *9. While evidence of prior substantially similar crimes is "one of the most probative considerations in answering that question, it is not a required consideration, and other circumstances may be relevant, too." <u>Id.</u> Here, Defendant moves for summary judgement based on Plaintiff's failure to show prior criminal acts, which is not required, so it has not met its burden in showing it is entitled to judgment as a matter of law. (Doc. 103, at 9-11); <u>City of Columbus</u>, 120 F.3d at 254 (finding the Court must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and

---

[6] The Court notes the unique procedural posture of this case. The Georgia Supreme Court's <u>Carmichael</u> decision was released between the time the Parties briefed this case and the Court's review. However, the <u>Carmichael</u> decision does not overturn any existing Georgia law; rather, the decision clarifies the standard. 2023 WL 4247591, at *1. The Georgia Supreme Court specifically stated its decision is consistent with the Georgia Supreme Court's decisions spanning the past 70 years. <u>See id.</u> at *9.

that it is entitled to judgment as a matter of law). As such, Defendant's motion for summary judgment on Plaintiff's premises liability claim is **DENIED**.

### 2. Negligent Hiring, Retention, Supervision, and Training Claims

Defendant next moves for summary judgment on Plaintiff's negligent hiring, retaining, supervising, and training claims. (Doc. 103, at 15-22.) Before addressing the merits of Defendant's motion, the Court addresses Defendant's challenges to the evidence proffered by Plaintiff.

#### a. *Evidentiary Challenges*

Defendant makes two evidentiary challenges to the evidence proffered by Plaintiff. As for the first challenge, Defendant argues the evidence Plaintiff puts forth in support of its position that "[Ms. Thomas] reported [Mr.] McLamore's alleged sexual misconduct to management" is hearsay. (Doc. 117, at 13.) Plaintiff relies on two instances to show Ms. Thomas reported Mr. McLamore's conduct. (Doc. 113, at 10.) First, according to Plaintiff, "[b]efore D.W.'s sexual assault and [alleged] rape, [Ms.] Thomas told [Ms.] Jackson that [Mr.] McLamore had been looking at and talking to [her] in a sexually inappropriate way." (Id.) Second, according to Plaintiff, "[a]fter D.W. reported the [alleged] rape, [Ms.] Jackson began crying and confessed that [Ms. Thomas] . . . had come to her with the complaint about [Mr.] McLamore." (Id.)

Plaintiff argues this evidence is admissible because Ms. Jackson's statements are statements made by the opposing party's employee on a matter within the scope of employment, admissible under Federal Rule of Evidence 801(d)(2), and Ms. Thomas's statements to Ms. Jackson are not offered to prove the truth of the matter asserted, but rather to "demonstrate notice to [Defendant]," rendering them admissible under Rule 801(c)(2). (Doc. 124, at 7-8.) Contrary to Plaintiff's position, the Court finds these statements are only relevant if offered for the truth of the matter asserted – whether Mr. McLamore had engaged in sexually inappropriate conduct before. See Brewster-Veira v. United States, No. 1:18-CV-02858, 2019 WL 4804267, at *4 (N.D. Ga. July 22, 2019). Because Federal Rule of Civil Procedure 56 requires facts to be supported by admissible evidence and Federal Rule of Evidence 805 provides "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule," this evidence is not admissible. Fed. R. Civ. P. 56; Fed. R. Evid. 805.

As for the second challenge, Defendant moves to strike paragraph nine of Ms. Spencer's declaration as it "is in direct conflict with her prior testimony and no explanation is offered for the contradiction." (Doc. 117, at 12 n.9.) Plaintiff does not appear to respond to this argument. Paragraph nine of Ms. Spencer's declaration relates to the meeting Mr. Carter called amongst employees about two weeks before the alleged rape. (Doc.

113-18, at 3.)   Paragraph nine states: "[t]he group talked about [Mr.] McLamore.   [Mr. Carter] mentioned that he was concerned by [Mr.] McLamore's sexually inappropriate behavior toward [D.W.].   I told [Mr. Carter] that [Mr.] McLamore gave off weird, sexually predatory vibes, especially toward [D.W.], and that his behavior made me feel uncomfortable."   (Id.)   At Ms. Spencer's deposition, the following line of questioning took place:

> Q: And did you tell [Mr. Carter] that [Mr.] McLamore made you feel uncomfortable at times?
> A: No.
> Q: Did [Mr.] McLamore ever make you feel uncomfortable?
> A: No.   I really never paid him no attention.   I really never paid nobody any attention.   I really just came to work.

(Doc. 117-9, at 4.)

Under the "sham affidavit rule," "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Benjamin v. Experian Info. Sols., Inc., 561 F. Supp. 3d 1330, 1350 (N.D. Ga. 2021) (quoting Van T. Junkins & Assoc. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984)).   Here, the Court will not strike all of paragraph nine but does agree the statement in which Ms. Spencer said Mr. McLamore made her "uncomfortable" directly contradicts her deposition testimony and no valid explanation was given for the contradiction.   As such, the Court will not consider the portion of paragraph nine of Ms. Spencer's declaration that

states, "and that his behavior made me feel uncomfortable."[7]   (Doc. 113-18, at 3.)   The Court now turns to the merits of Defendant's motion for summary judgment.

### b. *Merits*

As a preliminary matter, Defendant argues it is entitled to summary judgment on Plaintiff's negligent hiring, supervision, retention, and training claims because these claims are derivative of an underlying tort, and there is no underlying tort.   (Doc. 103, at 16-17.)   Defendant is not entitled to summary judgment on Plaintiff's premises liability claim, so this argument fails.   The Court turns to Defendant's remaining arguments.

### i. Negligent Hiring and Training

First, Defendant argues it is entitled to summary judgment on Plaintiff's negligent hiring and negligent training claims because Plaintiff failed to respond to these claims.   (Doc. 117, at 8 n.4.) The Court agrees: a review of Plaintiff's response shows she only addressed the negligent retention and negligent supervision claims.   (See Doc. 113, at 14-20.)   Therefore, the Court finds Plaintiff abandoned her claims of negligent hiring and negligent training, and the Court **GRANTS** summary judgment on these claims.

---

[7] The Court notes that Ms. Spencer's declaration preceded her deposition, and the Eleventh Circuit has recognized "it is much less likely that an affidavit which precedes a weak deposition is filed as a transparent sham than is a discrediting affidavit which is filed after a weak deposition which failed to establish a material issue of fact. . . ."   Tippens v. Celotex Corp., 805 F.2d 949, 954 n.6 (11th Cir. 1986).   However, in her deposition she was asked "did you look at your written statement before you came to this deposition?" and Ms. Spencer responded: "I looked at it when [I] was [] supposed to sign it but I didn't read word for word.   I just looked at it when I signed it." (Doc. 109-11, at 18.)

See <u>State Farm Mut. Auto. Ins. Co. v. Robert Eugene Marshall & Thomasina Parks</u>, 175 F. Supp. 3d 1377, 1385 (S.D. Ga. 2016) (citing <u>Jones v. Bank of Am., N.A.</u>, 564 F. App'x 432, 434 (11th Cir. 2014)) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.")   Therefore, the only claims that remain are negligent supervision and retention, which the Court now addresses.

> ii. Negligent Supervision and Retention

Defendant argues it is entitled to summary judgment on Plaintiff's negligent supervision and negligent retention claims. (Doc. 103, at 18-22.)   First, Defendant argues it had no knowledge of Mr. McLamore's propensity to commit sexual assault because: (1) "[n]o manager ever received a complaint that [Mr.] McLamore had behaved in a sexually inappropriate or physically threatening manner;" (2) "[t]here also is no evidence that any employee ever made a complaint that [Mr.] McLamore engaged in a sexually inappropriate or physically threatening manner prior to June 28, 2021;" and (3) even if a manager had received a complaint, the evidence is too subjective and "insufficient as a matter of law to put [Defendant] on notice that it would be foreseeable that [Mr.] McLamore would later sexually assault [D.W.]."   (<u>Id.</u> at 18-19.) In response, Plaintiff argues Defendant had both actual and constructive notice of Mr. McLamore's "dangerous sexual propensities." (Doc. 113, at 15-16.)   Plaintiff presents evidence in support of its position that Defendant had the requisite

knowledge and should have foreseen Mr. McLamore's alleged sexual assault and rape.  (Id. at 5-10.)  Because the resolution of this motion turns on Defendant's knowledge, the Court begins by laying out the evidence Plaintiff proffers to demonstrate knowledge.

## I. Evidence Presented by Plaintiff to Show Knowledge

Plaintiff puts forth the following arguments to show Defendant's knowledge.

### A. Rod Carter

Plaintiff argues Mr. Carter had actual knowledge of the danger posed by Mr. McLamore and Mr. Carter's knowledge is imputed to Defendant.  (Id. at 5-6, 17.)  According to Plaintiff, about two weeks before the alleged rape, Mr. Carter called an informal meeting of employees, where he "told everyone that [he] had noticed that [Mr.] McLamore was sexually attracted to [D.W.] in a perverted way . . . [and] thought [Mr.] McLamore might do something bad toward [D.W.]" (Id. at 5-6.)  According to Plaintiff, "[f]rom the first time [Mr.] Carter saw [Mr.] McLamore interact with D.W., he 'noticed that [Mr.] McLamore had a perverted sexual attraction to [D.W.] . . . based on [Mr.] McLamore's body language and the way he looked at [D.W.]"  (Id. at 5, 24.)  Plaintiff states "[Mr.] Carter saw [Mr.] McLamore compliment D.W.'s physical appearance, ask whether D.W. had a boyfriend in a 'sexually suggestive way,' and obsessively follow D.W. around the store 'act[ing] like he was on a date' with her."  (Id. at 5.)

## B. Bobby Johnson

Plaintiff argues Mr. Johnson reported Mr. McLamore's sexually inappropriate behavior to Ms. Jackson before the alleged rape. (Id. at 6-7.)  Plaintiff states Mr. Johnson went to Ms. Jackson's office and told her that Defendant "needed to 'watch out' for [Mr.] McLamore and D.W. because he thought [Mr.] McLamore liked D.W. in a sexual way."[8]  (Id. at 7.)

## C. Tatiyana Woods

Plaintiff alleges Ms. Woods reported Mr. McLamore to at least three different managers before the alleged rape: Ms. Jackson, Ms. Thompkins (who is Mr. McLamore's mother), and Mr. Thomas. (Id. at 7-8.)  Plaintiff alleges Ms. Woods told Ms. Jackson that Mr. McLamore made her and other female employees "feel weird based on his sexually inappropriate behavior."[9]  (Id. at 7.)  She allegedly "told [Ms.] Thompkins that [Mr.] McLamore would frequently 'walk up behind us and touch our shoulders and tell us we're doing a good job, but it was just weird at the time.'"  (Id. at 8.)  Ms.

---

[8] Mr. Johnson's deposition reads:
> Q: What -- what did you tell Ms. Jackson?
> A: I went in the office. She was in the office at the time. I went in there, and I told her that they need to watch out for them two because something -- I think he like her.  And she looked and she was kind of like -- like, you know, "What?" you know, and then she told me she was going to keep an eye out.

(Doc. 113-3, at 8.)
[9] According to Ms. Woods' deposition, she told Ms. Jackson "[Mr. McLamore] is making us feel weird. He's making D.W. feel weird. She don't like the way he, you know, he looks at her, acts towards her." (Doc. 113-1, at 4.)  Ms. Woods says Ms. Jackson replied "[h]e wants a grown woman . . . [h]e doesn't want no kids" and then "she laughed it off."  (Id.)

Woods allegedly also "reported [Mr.] McLamore's sexually inappropriate behavior to [Mr. Thomas] before the [alleged] rape."[10]  (Id.)

### D. Brionna Williams

Plaintiff states Ms. Williams reported Mr. McLamore's sexually inappropriate behavior to management; specifically, to Mr. Thomas, and that she told Mr. Thomas she did not want to work with Mr. McLamore.  (Doc. 113, at 8-9.)  Defendant argues "Plaintiff patently mischaracterizes [Ms. Williams'] testimony as [Plaintiff] attempt[s] to bolster [her] false narrative" and that Ms. Williams only told Ms. Thomas she no longer wished to work with Mr. McLamore.  (Doc. 117, at 11-12.)  The Court has reviewed Ms. Williams' deposition testimony and is not certain at this stage what exactly Ms. Williams reported.  In her deposition, Ms. Williams states:

> A: I did tell [Mr.] Thomas about [Mr. McLamore.]
> Q: What did you tell [Mr. Thomas] about [Mr. McLamore]?
> A: I told him that I didn't want to be on the same schedule [as] him anymore, basically, as I didn't want to close with him anymore.  Because he really – he closed – he really didn't open the store.  So – and like I said,

---

[10] The line of questioning in Ms. Woods' deposition is as follows:

> Q: Okay.  Is it true you also reported Mr. McLamore's sexually inappropriate behavior to [Mr.] Thomas?
> A: Yes sir.  I did tell [Mr. Thomas] that, you know, [Mr. McLamore] was giving people weird vibes.
> Q: And you told Mr. Thomas that before the sexual assault?
> A: Yes, sir.

(Id. at 14.)  Ms. Woods' declaration states: "Before June 28, 2021, I also told [Mr. Thomas] about [Mr.] McLamore's inappropriate behavior toward [D.W.] and me.  He said he'd do something about it."  (Doc. 113-2, at 3.)

> I was in school, so I was closing, so – and I told him
> I didn't want to close with him anymore because he gave
> creep vibes, and I don't want to be on the same schedule
> as him anymore.
> Q: Did you tell [Mr. Thomas] any other reasons why you
> didn't want to work with [Mr. McLamore]?
> A: No, sir.

(Doc. 113-4, at 5.)   Moreover, later in her deposition, Ms.

Williams discussed how Mr. McLamore asked female employees if they

had sex before, and Ms. Williams was asked: "Did you, did you ever

tell another manager about that – about [Mr. McLamore] asking you

that question?" (Doc. 113-4, at 9.)   Ms. Williams replied: "No,

sir."   (Id.)   However, later in Ms. Williams' deposition, she

testified:

> Q: Okay.  So before you reported [Mr.] McLamore to [Mr.]
> Thomas, you had seen him staring at D.W.'s butt,
> following her around the store inappropriately, and
> asking minor females about sex; is that, is that right?
> A: Yes.  Yes, sir.
> Q: Did all of those things lead to your decision to tell
> [Mr.] Thomas that you felt uncomfortable around [Mr.
> McLamore]?
> A: Yes, sir.
> ***
> Q: So it, it was really just the talking about sex with
> female – minor female employees, staring at D.W.'s butt,
> and then just compulsively following D.W. around the
> store?
> A: Yes, sir,
> Q: Okay. And when you told [Mr.] Thomas about that, did
> you expect him to do something about it?
> A: Yes, sir.  I expected him to change my schedule or
> either, you know, change his schedule.

(Id. at 16.) Due to this conflicting testimony, the Court cannot

determine what exactly Williams reported to Mr. Thomas at this

stage.  On a motion for summary judgment, the Court must view all

21

evidence in favor of the non-moving party and draw "all justifiable inferences" in the non-moving party's favor, so the Court, for the purposes of this motion, accepts that Ms. Williams reported to Mr. Thomas that Mr. McLamore talked about sex with minor female employees, stared at D.W.'s butt, and followed her around the store. See Matsushita Elec. Indus. Co. 475 U.S. at 587; see also Four Parcels of Real Prop., 941 F.2d at 1437.

### E. Imani Spencer

Plaintiff argues Ms. Spencer reported Mr. McLamore's sexual misconduct to management, specifically, to Mr. Carter. (Doc. 113, at 9.) Plaintiff states that about two weeks before the alleged rape, Mr. Carter called a meeting among employees to discuss Mr. McLamore, and at that meeting, Ms. Spencer told Mr. Carter that "[Mr.] McLamore gave off weird, sexual predatory vibes, especially toward [D.W.]. . . ."[11]  (Id.)

### F. Khashiaya Thomas

Plaintiff also argues Ms. Thomas reported Mr. McLamore to management.  (Id. at 10.)  However, as discussed above, these alleged statements are inadmissible hearsay the Court will not consider.  (See supra Section II.B.2.a.)

---

[11] As previously discussed, the Court will not consider Ms. Spencer's statement that she reported that McLamore "made her uncomfortable." (See supra Section II.B.2.a.)

## II. Analysis

The Court now turns to the merits of Defendant's motion for summary judgment. Under Georgia law, a claim for negligent retention or supervision arises when an employer negligently retains or supervises an employee and that employee subsequently harms the plaintiff. Farell v. Time Serv., Inc., 178 F. Supp. 2d 1295, 1300 (N.D. Ga. 2001); see also O.C.G.A. § 34-7-20 (an "employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency"). "To establish such a claim, the plaintiff must allege, and ultimately prove, the employer knew or should have known of the employee's propensity to engage in the conduct which caused the plaintiff's injury." Farell, 178 F. Supp. 2d at 1300 (quoting Harper v. City of East Point, 515 S.E.2d 623, 625 (Ga. Ct. App. 1999)(quotation marks omitted); citing Odom v. Hubeny, Inc., 345 S.E.2d 886, 888 (Ga. Ct. App. 1986)). Moreover, "[a] claim for negligent retention is necessarily derivative and can only survive summary judgment to the extent that the underlying substantive claims survive the same." Metro. Atl. Rapid Transit Auth. v. Mosley, 634 S.E.2d 466, 469 (Ga. Ct. App. 2006) (citations omitted). Here, the question before the Court is whether there is sufficient evidence to raise an issue of material fact as to

whether Defendant knew or should have known of Mr. McLamore's propensity to engage in sexual assault.[12]

In support of its motion for summary judgment, Defendant argues that "[n]o manager ever received a complaint that [Mr.] McLamore had behaved in a sexually inappropriate or physically threatening manner" and even so, the evidence presented by Plaintiff "is insufficient as a matter of law to put [Defendant] on notice that it would be foreseeable that [Mr.] McLamore would later sexually assault [D.W.]." (Doc. 103, at 18-19.) Defendant argues the statements made about Mr. McLamore giving off "weird" and "creepy" vibes were entirely too vague and subjective to put it on notice that Mr. McLamore had the propensity to sexually assault someone. (Id. at 20.) In response, Plaintiff argues there is sufficient evidence that Defendant knew or should have known of the danger posed by Mr. McLamore. (Doc. 113, at 17.)

Negligent supervision and retention each require a showing that the defendant had actual or constructive knowledge of the danger that resulted in plaintiff's injury. Doe v. Saint Joseph's

---

[12] In Plaintiff's Response to Defendant's SUMF, Plaintiff alleges Mr. McLamore sexually assaulted D.W. in the men's restroom and soon after raped D.W. in the women's restroom. (See Doc. 116, at 28.) However, at times, Plaintiff refers to the alleged conduct of Mr. McLamore as both "sexual assault and rape," and at other times, refers to the alleged conduct as "sexual assault" or "rape." (See e.g., Doc. 113, at 5, 16, 19.) Defendant, on the other hand, refers to the conduct as "sexual assault." (Doc. 117, at 5.) This difference does not affect the Court's analysis because "it is not necessary that the employer 'should have contemplated or even be able to anticipate the particular consequences which ensued, or the precise injuries sustained by the plaintiff.'" Remediation Res., Inc. v. Balding, 635 S.E.2d 332, 335 (Ga. Ct. App. 2006) (citations omitted).

Cath. Church, 870 S.E.2d 365, 374 (Ga. 2022); Novare Grp., Inc. v. Sarif, 718 S.E.2d 304, 309 (Ga. 2011) ("For an employer to be held liable for negligent supervision, there must be sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff." (citations and quotation marks omitted).)

In order to prevail on negligent supervision and retention claims, Georgia courts look to whether "an employer knew or should have known that an employee previously engaged in conduct that allegedly caused plaintiff's present injuries." See Madrid v. Homeland Sec. Sols. Inc., 141 F. Supp. 3d 1351, 1366 (M.D. Ga. 2015) ("Devoid of evidence suggesting an employer knew or should have known that an employee previously engaged in conduct that allegedly caused plaintiff's present injuries, a court is correct in granting summary judgment as it relates to a negligent retention claim." (citation omitted)); Wynn v. Paragon Sys., Inc., 301 F. Supp. 2d 1343, 1355 (S.D. Ga. 2004) ("Under Georgia common law, a plaintiff may recover in tort from an employer for negligent retention of an employee if the employer knew or should have known that the employee was engaging in sexual harassment.") (citation omitted); Herron v. Morton, 155 F. App'x 423, 426 (11th Cir. 2005) ("[T]o prevail on their state law claims, the plaintiffs had to produce evidence that the defendants knew or reasonably should

have known [the employee] was engaging in sexual harassment.")
Such evidence does not exist here.

Plaintiff relies on Cox v. Brazo for the proposition that the
question of foreseeability is for the jury when there is some
evidence of foreseeability presented. (Doc. 113, at 17 (citing
Cox, 303 S.E.2d 71, 73 (Ga. 1983).) In Cox, "there was evidence
in the record regarding the assailant's alleged sexual misconduct
directed toward the plaintiff and other female employees and that
the employer knew or should have known of the assailant's alleged
behavior." (Doc. 113, at 17 (quoting Cox, 303 S.E.2d at 73)
(alterations adopted).) However, Cox is distinguishable from the
case at hand. Cox "involve[d] employees whose previous behavior
constituted sexual harassment." Herron, 155 F. App'x at 427 n.6
(finding Cox inapplicable when the employee's behavior did not
constitute sexual harassment). Here, however, as highlighted by
Defendant,

> there is no allegation, and there are no facts, stating
> that [Mr.] McLamore sexually assaulted, or threatened to
> sexually assault, [D.W.] or any other employee prior to
> the incident in question, nor is there any employment or
> criminal history that demonstrated such conduct. It
> also is undisputed . . . that no one ever suggested to
> BWNC management that [Mr.] McLamore had violent
> tendencies or propensities that created a risk of a
> sexual assault in the workplace.

(Doc. 117, at 15.) Defendant cannot be said to have known or
should have known of Mr. McLamore's propensity to commit sexual
assault based on the evidence before the Court. Other than the

evidence that on Mr. McLamore's first day of work he asked minor, female employees if they had sex before,[13] none of the evidence appears to be sexual in nature.   For example, when Ms. Woods was asked why she described Mr. McLamore as "weird," she said:

> I say weird because, he'll stare at you for long periods of time.   Like I said, he'll walk up behind us, touch our shoulders, on our sides, and tell us keep up the good work.  He always nitpicked and had a[n] issue.   He would always chew people out for issues.   Like I said, he'll sit down and talk to employees for long periods of time.     He  comes  to  work  early  just  [to]  have conversations with us, like he's our friend and, you know, he was our manager at the time, so we didn't look at him like that.

(Doc. 113-1, at 7.)   Moreover, Plaintiff states Mr. Carter thought Mr. McLamore posed a risk to D.W. because he "noticed that [Mr.] McLamore had a perverted sexual attraction to [D.W.] . . . based on [Mr.] McLamore's body language and the way he looked at [D.W.]," "[Mr.]  Carter  saw  [Mr.]  McLamore  compliment  D.W.'s  physical appearance,  ask  whether  D.W.  had  a  boyfriend  in  a  'sexually suggestive  way,'  and  obsessively  follow  D.W.  around  the  store 'act[ing]  like  he  was  on  a  date'  with  her."[14]   (Doc.  113,  at  5.)

---

[13] Plaintiff relies on other instances such as reports that the prior manager got an 18-year-old employee pregnant. (Doc. 113, at 13.)  However, on negligent supervision and retention claims, the question is the employer's knowledge of "the employee's tendencies or propensities that the employee could cause the type of harm sustained by the plaintiff." Drury v. Harris Ventures, Inc., 691 S.E.2d 356, 359 (Ga. Ct. App. 2010) (citation and quotation marks omitted). Therefore, the Court only looks to the evidence related to Mr. McLamore's tendencies or propensities to commit sexual assault.

[14] The Parties dispute whether  Mr. Carter was a manager, but the Court does not resolve this dispute because regardless of whether Mr. Carter was a manager or not, his knowledge is insufficient to demonstrate Mr. McLamore had a propensity to commit sexual assault.

However, this is not enough to put Defendant on notice of Mr. McLamore's tendencies or propensities to commit sexual assault. Absent evidence Mr. McLamore previously engaged in conduct that allegedly caused D.W.'s injuries - sexual assault - the Court cannot say the risk was foreseeable. See Madrid, 141 F. Supp. 3d at 1366 (alleged sexual harassment at work, including comments about the color of the plaintiff's underwear not enough to prove the employee "had a propensity to act in that way"); see also Morgan v. Fellini's Pizza, Inc., 64 F. Supp. 2d 1304, 1317 (N.D. Ga. 1999) (single statement by manager that there had been a "problem" with the male co-worker, which the plaintiff inferred was sexual in nature, not sufficient to put defendant on notice); see also Herron, 155 F. App'x at 426-27 (complaints that the employee hit one woman on the thigh and stared at several other female employees not sufficient to provide employer notice of employee's propensity to engage in sexual harassment).  Moreover, D.W. testified that before June 28, 2021, she had only worked with Mr. McLamore on three occasions, and she felt comfortable talking to him about personal issues, never had any issues with him, never had any romantic physical or sexual contact with him, never observed him engaging in a sexually inappropriate or physically threatening manner with any employee, never thought he flirted with her, never told anyone at BOJ that she felt uncomfortable with him, nor ever requested not to work with him.  (Doc. 103, at

18-19; Doc. 104, at 4.)   On such facts, Defendant simply cannot have anticipated that Mr. McLamore would sexual assault D.W.   See e.g., <u>Brown v. Brown</u>, 739 N.W.2d 313, 319 (Mich. 2007) ("It is inconceivable that defendant's management officials should have anticipated or predicted [the employee's] behavior any better than plaintiff, who directly witnessed the tone and tenor of [the employee's] offensive statements and yet indicated that she never feared for her physical safety.").

Plaintiff also argues Mr. Mclamore's conduct violated Defendant's Sexual Harassment policy, and "an employer cannot 'prevail by asserting lack of knowledge when the slightest investigation or merely permitting the employee to explain would have provided them with the knowledge they deny." (Doc. 113, at 16 (citing <u>Coleman v. House Auth. of Americus</u>, 381 S.E.2d 303, 307 (Ga. Ct. App. 1989).)   Defendant argues that "Plaintiff places the cart before the horse in arguing that the failure to follow an internal policy suddenly vests [Defendant] with legally sufficient knowledge that [Mr.] McLamore would sexually assault [D.W.]" (Doc. 117, at 14.)   Defendant argues "no complaint ever mentioned sexual harassment or sexual misconduct, let alone advised of any fact or circumstance suggesting [Mr.] McLamore was an individual potentially likely to engage in the crime of sexual assault." (<u>Id.</u>)   The Court agrees with Defendant; unlike <u>Coleman</u> where the plaintiff presented evidence that the employee sexually harassed

her over several years and that the commissioners who hired the employee had information about the employee's sexual propensities before hiring him, as discussed above, there is no evidence that Mr. McLamore sexually harassed D.W. prior to June 28, 2021. See Coleman, 381 S.E.2d at 305, 307. Therefore, even if Defendant had acted upon information Plaintiff alleges was given to it, an investigation would not have revealed that Mr. McLamore had a propensity for sexual assault.

In addition to presenting the above evidence to establish foreseeability, Plaintiff asks the Court to deny Defendant's motion for summary judgment because "[Mr.] McLamore's conduct shows 'an increasingly aggressive progression of sexual deviancy'" that could result in a sexual assault. (Doc. 113, at 18-19 (citing Harper, 515 S.E.2d at 625).)

In Harper, the court determined that a jury could find the City of East Point had warning that a police officer's "behavior reflected an escalating sexual deviancy likely to result eventually in the sexual assault of a female while he was on duty." 515 S.E.2d at 626. In Harper, the offending police officer had previously "pled guilty to making harassing phone calls to a female companion and had misrepresented in his employment application his relationship to that woman;" and after the City hired him, "a citizen's complaint . . . resulted in an investigation that uncovered three sexually inappropriate encounters between [the

officer] and female citizens." Id. at 625. As for the first incident, the officer purported to conduct an investigation and "queried a woman in a parking lot . . ., asked whether she was cold in her spandex shorts[,] and leered at her body." Id. He then followed her in his car until she entered her apartment complex. Id. As for the second incident, under the guise of an "investigation," the officer asked a woman "whether she was wearing shorts under her nightgown, commented on her tan, inquired if she was married, and remarked she needed a boyfriend to take care of her." Id. He then called her to his car window to ask "if she was sure she did not need a boyfriend" and then came to the woman's house later. Id. The woman did not pursue the matter further out of fear of the officer. Id. As for the third incident, the officer was making official inquires and "tried to look around [a woman's] door as she stood in her nightgown behind it." Id.

Here, Plaintiff argues Harper "requires a finding that [Mr.] McLamore's sexual assault and rape were foreseeable" and that "[c]ritically, none of the prior instances [in Harper] involved a physical sexual assault." (Doc. 113, at 18.) However, in Harper, the court found it significant that the police officer was acting under the power of his position as a police officer, "the female officer investigating the matter for the City reported to her superior that based on the standard sex crimes courses in which all officers are trained, she felt [the officer's] behavior was a

'textbook case' of sexual deviancy and should be investigated further," and the officer "acted upon those tendencies by harassing women and following one in his car." 515 S.E.2d at 626. Harper is distinguishable from the case at hand because here, there was no indication prior to June 28, 2021, that Mr. McLamore would act on his tendencies: there is no evidence that Mr. McLamore previously sexually assaulted an employee, threatened to sexually assault an employee, or acted in such a way that it could be foreseeable he would sexually assault or physically attack an employee.

Finally, the Court notes that Plaintiff argues "heightened monitoring was required" because Defendant "was responsible for overseeing employees who had 'unsupervised contact with youth.'" (Doc. 113, at 15 (citing Munroe v. Universal Health Servs., Inc., 596 S.E.2d 604 (Ga. 2004); Allen v. Zion Baptist Church of Braselton, 761 S.E.2d 605 (Ga. Ct. App. 2014); Underberg v. S. Alarm, Inc., 643 S.E.2d 374 (Ga. Ct. App. 2007)).) However, foreseeability is still required even if Defendant had a heightened duty to monitor. For example, in Underberg, the Court found there was an outstanding jury question as to whether an employee who kidnapped a woman at gunpoint was properly screened during the hiring process. 643 S.E. 2d at 112. In Uderberg, a proper screening of the employee would have revealed he was previously convicted of burglary and kidnapping and sentenced to prison,

possibly rendering the harm suffered by the plaintiff foreseeable. Id. at 108.   Similarly, in Allen, a church allowed a youth group volunteer to have "unsupervised contact with children before it checked his references," which "would have yielded some evidence that [the volunteer] had attempted to molest a child – the same category of criminal and tortious conduct of which the[] plaintiffs complain."  761 S.E.2d at 611.  Here, as discussed above, even if Defendant had implemented heightened monitoring, it was not foreseeable that Mr. McLamore would sexually assault D.W.  As such, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's negligent supervision and retention claims.

## C. Punitive Damages

Defendant argues it is also entitled to summary judgment on Plaintiff's punitive damages claims, or alternatively that the Court should apply the statutory cap on punitive damages because "there is no evidence that [Defendant] committed any alleged tort with the *specific* intent to cause [D.W.] harm." (Doc. 103, at 22-24 (emphasis in original).)  "To recover punitive damages in a premises liability action, a plaintiff must 'prove by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Orr v. Macy's Retail Holdings, Inc., No. 4:16-CV-52, 2018 WL 6729821, at *10 (S.D. Ga. Dec. 21, 2018) (quoting O.C.G.A. § 51-12-5.1) (alteration adopted). "Even

when punitive damages are warranted, they are limited to a maximum of $250,000.00, unless the defendant is found to have acted—or failed to act—with the specific intent to cause harm." Anderson v. Radisson Hotel Corp., 834 F. Supp. 1364, 1374 (S.D. Ga. 1993) (citing O.C.G.A. § 51-12-5.1 (f), (g)).

Defendant argues Plaintiff's claims for punitive damages fail because punitive damages require "an underlying legal violation to be actionable." (Doc. 103, at 22.) Next, Defendant argues it is entitled to summary judgment on Plaintiff' punitive damages claims because "Plaintiff has not shown [Defendant] acted in a manner that would support an award of punitive damages . . . [and] vague, murky complaints based on 'weird' or 'creepy' vibes and unvoiced suspicions simply do not merit any award of punitive damages." (Id. at 22-23 (citation omitted).)

Punitive damages are a derivative claim that require an underlying legal violation not be actionable. Popham v. Landmark Am. Ins. Co., 798 S.E.2d 257, 264 (Ga. Ct. App. 2017). Defendant is entitled to summary judgment on Plaintiff's negligent hiring, retention, supervision, and training claims, so the Court **GRANTS** Defendant's motion for punitive damages on these claims. As for the premises liability claim, because the Court has not evaluated the evidence related thereto, the Court **DENIES** Defendant's motion for summary judgment as to punitive damages on the premises liability claim.

As for imposition of the $250,000.00 cap, Defendant argues "there is no evidence that [Defendant] committed any alleged tort with the *specific* intent to cause [D.W.] harm," so the cap should apply. (Doc. 103, at 23 (emphasis in original).) However, "[i]t is not enough to move for summary judgment . . . with a conclusory assertion that the plaintiff has no evidence to prove his case." Celotex Corp., 477 U.S. at 328; see also Four Parcels of Real Prop., 941 F.3d at 1438 n.19. Defendant has not met its burden and thus, Defendant's motion for summary judgment on the $250,000.00 cap is **DENIED**.

### III. REQUEST FOR FILING ORIGINAL DISCOVERY

Defendant also filed a request for filing of original discovery. (Doc. 108.) Defendant requests Plaintiff file the original transcripts for eight depositions for the Court's consideration of Defendant's motion for summary judgment. (Id. at 1.) Plaintiff filed the requested transcripts (see Doc. 112); as such, Defendant's motion (Doc. 108) is **DENIED AS MOOT**.

### IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 103) is **GRANTED IN PART AND DENIED IN PART** and Defendant's request for filing of original discovery (Doc. 108) is **DENIED AS MOOT**. The case **SHALL**

proceed to trial in due course on Plaintiff's claims of premises liability and punitive damages.

**ORDER ENTERED** at Augusta, Georgia, this _12th_ day of September, 2023.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA